**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **Malikie Innovations Ltd. and Key Patent Innovations Ltd.,** | § § § § § § § § § § § § § § | |
| **Plaintiffs,** | | **CIVIL ACTION NO.: 2:26-cv-00597** |
| **v.** | | **JURY TRIAL DEMANDED** |
| **Abbott Laboratories Inc. and Advanced Neuromodulation Systems, Inc., Defendants.** | | |

**COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND**

Plaintiffs Malikie Innovations Ltd. ("Malikie") and Key Patent Innovations Ltd. ("KPI") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint for patent infringement and damages against Defendants Abbott Laboratories Inc. ("Abbott Labs") and Advanced Neuromodulation Systems, Inc. ("ANS") (collectively "Defendants") and, in support, allege the following:

**PARTIES**

1.      Plaintiff Malikie is the successor-in-interest to a substantial patent portfolio created and procured over many years by BlackBerry Ltd., formerly known as Research in Motion Ltd., and its predecessor, subsidiary, and affiliated companies (collectively, "BlackBerry").  Malikie is an Irish entity duly organized and existing under the laws of Ireland.  Malikie has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

2.      Plaintiff KPI is the beneficiary of a trust pursuant to which Malikie owns, holds, and asserts the Asserted Patents (set forth below).  KPI is an Irish entity duly organized and existing

under the laws of Ireland.  KPI has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

3.     On information and belief, Defendant Abbott Labs is a corporation organized under the laws of the State of Delaware and has a primary place of business at 100 Abbott Park Road, Abbott Park, IL 60064.

4.     On information and belief, Defendant Abbott Labs owns and operates the website at www.abbott.com.

5.     On information and belief, Abbott Labs has a regular and established place of business in Plano, TX related to its neuromodulation/neurostimulation products that are used to treat chronic pain and movement disorders.

6.     On information and belief, Defendant ANS, now a wholly owned subsidiary of Abbott Labs, has a principal place of business at 6901 Preston Road, Plano, TX 75024.  Abbott Labs acquired St. Jude Medical on January 4, 2017.  St. Jude Medical acquired Defendant ANS on October 16, 2005,

7.     On information and belief, Defendant ANS serves as a hub for Abbott Labs to develop and manufacture advanced, implantable medical devices designed to treat chronic pain and movement disorders, such as Parkinson's disease, through electrical stimulation.  On its website for careers, Abbott Labs lists various job postings, including one for a "senior electrical engineer" for the Neuromodular Division in Plano, Texas.[1]  Defendants' online job posting describes that the position "works out of our Plano, TX location in the Neuromodulation Division.

---

[1] *See, e.g.*, https://www.jobs.abbott/us/en/job/31149581/Sr-Electrical-Engineer (last accessed July 21, 2026).

Our Neuromodulation business includes implantable devices compatible with mobile technology to help people who suffer from chronic pain and movement disorders."[2]

8.    Defendants make, sell, offer for sale in the United States, and/or import into the United States, health care products, including but not limited to neuromodulation/neurostimulation products for chronic pain and movement disorders.

9.    On information and belief,  Defendants have placed or contributed to placing infringing products like Defendants' neurostimulation systems such as the Abbott Infinity Deep Brain Stimulation System ("Infinity DBS") and Abbott Liberty RC Deep Brain Stimulation System ("Liberta RC DBS")  ("Accused Device Products") into the stream of commerce via an established distribution channel knowing or understanding that such products would be sold and used in the United States, including in the Eastern District of Texas.

10.    On information and belief, Defendants have placed or contributed to placing infringing products (e.g., apps on a mobile device (e.g., smartphone, tablet, etc.)) NeuroSphere Digital Health app, NeuroSphere Virtual Clinic app, Patient Controller NR app, Patient Controller RC app, (collectively, "Accused Software Products") into the stream of commerce via an established distribution channel knowing or understanding that such products would be sold and used in the United States, including in the Eastern District of Texas.  On information and belief, some or all of the Accused Software Products share the same backend (e.g., backend application, server-side software etc.) designed and/or operated by either Defendant Abbott Labs and/or its subsidiary Defendant ANS.  The Patient Controller NR app is used in conjunction with the Infinity DBS.  The Patient Controller RC app is used in conjunction with the Liberta RC DBS.

---

[2] *Id.*

11.    The Accused Device Products and the Accused Software Products are collectively referred to as the "Accused Product."

12.    On information and belief, the Accused Software Products are used in conjunction with the Accused Device Products to improve health outcomes by facilitating remote care, improving data accuracy for clinicians (e.g., physicians, healthcare providers, etc.), and allowing users (e.g., patients) to manage their conditions conveniently from their mobile devices.

13.    On information and belief, Defendants have also derived substantial revenues from infringing acts in the Eastern District of Texas.

14.    Defendants share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and accused product lines and products involving related technologies.  Abbott Labs directs and controls its subsidiaries, including ASN. For example, Abbott Labs, in its own 2025 Annual Report, states that "[f]or segment reporting purposes, the Rhythm Management . . . Neuromodulation, and Diabetes Care businesses are aggregated and reported as the Medical Devices segment."[3]  In the same 2025 Annual Report, Abbott Labs affirmatively states that "[t]he chief operating decision maker (CODM) at Abbott is the Chief Executive Officer."[4]  Moreover, as shown in its Form 10-K filed with the SEC on December 31, 2025, Abbott Labs reports consolidated revenues for its business segments.[5]

15.    Defendants regularly contract with customers regarding products made for or on behalf of those customers.

---

[3] *See, e.g.*, Abbott Labs 2025 Annual Report, at page 60, available at
https://www.abbottinvestor.com/static-files/2db8f507-2fd9-4def-a76f-d7d32773cb5c.
[4] *Id.*
[5] *See, e.g.*, Abbott Labs Form 10-K for the fiscal year ending in December 31, 2025, available at
https://www.abbottinvestor.com/static-files/2cec64ee-cb9c-4880-a582-bdb7af1ad810.

16.     Defendants operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein.

17.     On information and belief, Abbott Labs and/or their employees or officers direct and/or control the actions of its direct and indirect subsidiaries.  On information and belief, Abbott Labs and/or its employees or officers direct and/or control the actions of these entities by, for example, inducing and contributing to the actions complained of herein.

## PATENTS IN SUIT

18.     Malikie is the assignee of and owns all right and title to U.S. Patent Nos. 9,143,323 (the "'323 Patent"); 7,664,707 (the "'707 Patent"); 8,261,338 (the "'338 Patent"); 8,447,696 (the "'696 Patent"); and 11,119,756 (the "'756 Patent) (collectively, the "Asserted Patents").

19.     BlackBerry developed numerous innovative and diverse technologies, including groundbreaking inventions pertaining to mobile devices and related software and wireless communications technology.   Some of these groundbreaking inventions are described and claimed in many of the Asserted Patents.

20.     BlackBerry was a pioneering technology company best known for transforming mobile communications in the late 1990s and 2000s.  The company was among the first to deliver push email, allowing real-time synchronization between corporate mail servers and handheld devices, which became a hallmark of enterprise mobility.  A key innovation behind BlackBerry devices was its BlackBerry Enterprise Server (BES), which securely connected mobile devices with corporate IT systems.  BES provided end-to-end encryption, centralized management, and data compression, making it one of the most secure and bandwidth-efficient enterprise mobility solutions of its era.  This backend architecture distinguished BlackBerry from competitors and cemented its reputation for unmatched security in mobile communications.  Beyond smartphones,

BlackBerry invested heavily in wireless networking, secure communications protocols, and mobile application platforms.  Many of its inventions anticipated modern standards in mobile data handling, encrypted communications, and device management.  Although BlackBerry eventually exited the hardware market, its early innovations in both devices and backend systems had a lasting influence on mobile security and enterprise mobility solutions.

21.    These types of technology created by BlackBerry may be used in a variety of commercial applications, including ensuring data privacy (e.g., patient information) and compliance (e.g., HIPAA) in the healthcare or medical device fields.  Blackberry developed numerous innovative and diverse technologies, including groundbreaking inventions at the intersection of secure mobile devices and enterprise infrastructure.  These innovations capture advances in user interface and messaging efficiency on handheld devices, seamless coordination between mobile hardware and backend servers, robust methods for secure data transmission and management, and refined frameworks for accessing and controlling enterprise applications.  Collectively, they demonstrate BlackBerry's leadership in creating a tightly integrated ecosystem of mobile devices and server technologies that delivered secure, reliable, and highly functional communications for business and government users.  Some of these groundbreaking inventions are described and claimed in certain of the Asserted Patents.

22.    The '323 Patent, entitled "Securing a Link Between Two Devices" was duly and lawfully issued on September 22, 2015.  A true and correct copy of the '323 Patent is attached hereto as Exhibit 1.

23.    The '707 Patent, entitled "System and Method for Handling Peripheral Connections to Mobile Devices," was duly and lawfully issued on February 16, 2010.  A true and correct copy of the '707 Patent is attached hereto as Exhibit 2.

6

24.     The '338 Patent, entitled "Policy Proxy," was duly and lawfully issued on September 4, 2012.  A true and correct copy of the '338 Patent is attached hereto as Exhibit 3.

25.     The '696 Patent, entitled "System and Method for Handling Peripheral Connections to Mobile Devices," was duly and lawfully issued on May 21, 2013.  A true and correct copy of the '696 Patent is attached hereto as Exhibit 4.

26.     The '756 Patent, entitled "System and Method for Controlling Updates to Internet-of-things Devices," was duly and lawfully issued on September 14, 2021.  A true and correct copy of the '756 Patent is attached hereto as Exhibit 5.

## JURISDICTION AND VENUE

27.     Plaintiffs re-allege and incorporate herein by reference the preceding paragraphs of their Complaint.

28.     This civil action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq., including without limitation 35 U.S.C. §§ 271, 281, 283, 284, and 285.  Thus, this is a patent infringement lawsuit over which this Court has subject matter jurisdiction under, inter alia, 28 U.S.C. §§ 1331, 1332, and 1338(a).

29.     This District has general and specific personal jurisdiction over Defendants because, directly or through intermediaries, Defendants have committed acts within this District giving rise to this action; are present in and transact and conduct business, directly, and/or indirectly, in this District and the State of Texas; and transact and conduct business with residents of this District and the State of Texas.

30.     Plaintiffs' causes of action arise, at least in part, from Defendants' contacts with and activities in and/or directed at this District and the State of Texas.

31.     Defendants have infringed the Asserted Patents within this District and the State of Texas by making, using, selling, licensing, offering for sale, and/or importing in or into this District and elsewhere in the State of Texas, products and services covered by claims in the Asserted Patents, including without limitation products that, when made or used, practice the claimed methods of the Asserted Patents.  Defendants, directly and through intermediaries, make, use, sell, license, offer for sale, import, ship, distribute, advertise, promote, and/or otherwise commercialize such infringing products and services in or into this District and the State of Texas.  Defendants regularly conduct and solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from goods and services provided to residents of this District and the State of Texas.

32.     This Court has personal jurisdiction over Defendants pursuant to TEX. CIV. PRAC. & REM. CODE § 17.041 *et seq*.

33.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c) and 1400(b).

34.     Defendant Abbott Labs is doing business, either directly or through respective agents, on an ongoing basis in this Judicial District and elsewhere in the United States, and has committed acts of infringement in this District.  Abbott Labs has a regular and established place of business in this Judicial District including: 6901 Preston Road, Plano, TX 75024.  On information and belief, Abbott Labs makes, uses, sells, offers to sell, and/or imports infringing products into and/or within this District, maintains a permanent and/or continuing presence within this District, and has the requisite minimum contacts with this District such that this venue is a fair and reasonable one.  Upon information and belief, Abbott Labs has transacted and, at the time of the filing of the Complaint, is continuing to transact business within this District.

35.    Defendant ANS is doing business, either directly or through respective agents, on an ongoing basis in this Judicial District and elsewhere in the United States, and has committed acts of infringement in this District.  ANS has a regular and established place of business in this Judicial District including: 6901 Preston Road, Plano, TX 75024.  On information and belief, ANS makes, uses, sells, offers to sell, and/or imports infringing products into and/or within this District, maintains a permanent and/or continuing presence within this District, and has the requisite minimum contacts with this District such that this venue is a fair and reasonable one.  Upon information and belief, ANS has transacted and, at the time of the filing of the Complaint, is continuing to transact business within this District.

### FIRST CLAIM

### (Infringement of the 9,143,323 Patent)

36.    Plaintiffs re-allege and incorporate herein by reference the preceding paragraphs of their Complaint.

37.    The claims of the '323 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

38.    The '323 Patent is generally directed to generating a cryptographic key used to secure a communication link between a first device and a second device.

39.    BlackBerry developed the technology in the '323 Patent to solve several technical problems in data networks associated with securing wireless communications.  At the time of the invention, "[v]arious security concerns exist with the use of cryptographic techniques.  For example, secrets need to be shared between the two communication devices in a secure and authenticated manner.  Especially in the case of mobile devices, it may be desirable to have only those two devices know the secret and not require the intervention/involvement of an Information

9

Technology (IT) administrator. Also, it may be desirable to verify that the devices share a secret without exposing that secret to others, and to use the secret to generate a key to secure a communication link between the devices." (Exhibit 1 at 1:17-26).

40. The '323 Patent solved these problems by requiring the two communication devices to establish "the symmetric key used to secure communications over a communication link." (Exhibit 1 at 3:11-15). In one example, a key is created over a communication link by the devices "each hash[ing] all the packets sent and received during the generation of symmetric keys K1 and K2 to produce the hash result H. For example, the selected hash function may be applied to the packets as the packets are sent and received, so that this is concurrent with generating the symmetric keys K1 and K2." (Exhibit 1 at 4:9-14). The two communication devices "each generate the same symmetric key K3 from K1, K2 and the hash result H." (Exhibit 1 at 4:21-26). "Symmetric key K3 may then be used to secure communications over communication link 106." (Exhibit 1 at 4:21-26). Using the symmetric key used to secure communications over a communication link, allows for secure communication between the devices without any intervention or involvement of an intermediary. *See e.g., id*. at 1:20-23, 3:16-52; 4:18-26. By basing the third key K3 on the combination of keys K1 and K2 and the hash result, the claimed invention protects the network against replay attacks, increases security, and prevents tampering with network connection, thereby preventing unauthorized access by a third party. Claim 1, for example, requires hashing network packets. This claim is aimed at physical network behavior, and, more particularly, to computer networking improvements that establish a secure communication channel(s) to protect against known active attacks. The claimed invention improves network functionality by efficient establishment of a communication link between devices with enhanced security to protect network data.

41.    Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '323 Patent, by making, using, testing, selling, leasing, licensing, offering for sale, and/or importing hardware and/or software such as the Defendants' neurostimulation systems such as: the NeuroSphere Digital Health platform app; the Patient Controller RC-US app (used in conjunction with the Liberta RC DBS System); and the Patient Controller NR-US app (used in conjunction with the Infinity DBS System).  On information and belief, these products utilize SSL/TLS data transfer encryption.  For example, Defendants' Infinity DBS System app ensures data security (e.g., protect confidential patient information) through encrypted Bluetooth connections, Secure Sockets Layer (SSL)/Transport Layer Security (TLS) data transfer encryption, and secure cloud storage in Defendants' NeuroSphere Digital Health platform app.  An exemplary claim chart concerning one way in which Defendants infringe claim 1 of the '323 Patent is attached as Exhibit 6.

42.    Defendants also indirectly infringed, and continues to indirectly infringe, the '323 Patent under 35 U.S.C. § 271(b) and (c).

43.    Defendants knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe, and continue to do so, at least claim 1 of the '323 Patent by, for example, having sold, offered for sale, and encouraged customers to use at least some or all of the Accused Product. Defendants, for example, instruct customers and users how to securely communicate document data, which infringes the '323 Patent. Defendants for example, on their website, acknowledge that Abbott's Infinity DBS system prioritizes patient privacy and security through encrypted, secure Bluetooth wireless technology connecting the Infinity DBS implantable device

to the NeuroSphere Patient Controller NR app.[6]  Likewise, on information and belief, Abbott's Liberta RC DBS system prioritizes patient privacy and security through encrypted, secure Bluetooth wireless technology connecting the Liberta RC implantable device to the Patient Controller RC app.[7]  This is to ensure sensitive patient information is encrypted using SSL/TLS to ensure that it remains private from malicious parties.

44.    Defendants contributed to, and continue to contribute to, the direct infringement of at least claim 1 of the '323 Patent under 35 U.S.C. § 271(c) by, for example, having supplied, with knowledge of the '323 Patent, a material part of a claimed invention, where the material part was not a staple article of commerce and was incapable of substantial non-infringing use.  For example, Defendants provided, owned, operated, sold, offered to sell, leased, and/or imported infringing wireless connectivity in the Accused Product (such as shown in Exhibit 6) that were not a staple article of commerce and were incapable of substantial infringing use.

45.    Malikie has repeatedly offered Defendants the opportunity to license its patents, including the '323 Patent. Defendants have been on notice of the '323 Patent and their infringement since at least October 2, 2025 and further have had notice of the specific factual basis for their infringement of the '323 Patent since at least the filing of this complaint.   On information and belief, Defendants have not taken any action to stop their infringement.

46.    Despite Malikie's repeated efforts, including the provision of multiple notice letters, claim charts, and patent-specific analysis, Defendants have not taken a license, have not negotiated in good faith, and instead continues to make use of Malikie's patented technology

---

[6] https://abbott.mediaroom.com/2018-08-02-Abbott-Expands-its-Directional-Deep-Brain-Stimulation-Therapy-by-Offering-New-MR-Conditional-Labeling
[7] https://www.neuromodulation.abbott/int/en/healthcare-professionals/movement-disorders/rechargeable-dbs.html

without authorization. As of the filing date of this action, more than six months have elapsed since Plaintiffs made a license offer to Defendants. Malikie is therefore left with no choice but to bring this action to enforce its rights that Defendants are willfully infringing.

47. Defendants' infringement is willful in view of the above, and their failure to take any action, even after being put on notice, to stop their infringement or inducement of, or contribution to, infringement by others.

**SECOND CLAIM**

**(Infringement of U.S. Patent No. 7,664,707)**

48. Plaintiffs re-allege and incorporate herein by reference the preceding paragraphs of their Complaint.

49. The claims of the '707 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

50. The '707 Patent is generally directed to systems and methods for securely establishing data connections between a mobile wireless device and a peripheral by having the mobile device application handle user approval to prevent unauthorized data transfer.

51. The claimed arrangements of the '707 patent are directed towards improvements in computer technology, and in particular to data security systems. Prior-art systems relied primarily on the peripheral (e.g., PC, cradle, or other external device) to provide the user interface and collect credentials to authorize data connections with a mobile device, with the peripheral supplying valid passwords or pre-provisioned security material (e.g., keys, certificates, CRLs) to the mobile device. The claimed invention instead enhances data security by moving connection approval and authentication control onto the mobile device application when a peripheral cannot prompt or supply credentials: it prompts the user (or uses the device unlock input) on the mobile device to

authorize peripheral-initiated data connections, enforces device password/policy (e.g., retry limits, hidden input, optional wipe), permits peripherals without local I/O to connect only after explicit mobile-side approval, and thereby preserves compatibility with USB/IR/Bluetooth etc. while reducing unauthorized access (e.g., Trojan-horse attacks) compared with prior systems that relied on the peripheral to collect credentials or be implicitly trusted.

52.    Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '707 Patent, by making, using, testing, selling, leasing, offering for sale, and/or importing Defendants' neurostimulation systems such as the Abbott Infinity Deep Brain Stimulation (DBS) System with related Patient Controller NR App and the Abbott Liberta RC DBS System with related Patient Controller RC App.  Both the Infinity DBS System and Liberta DBS System can be used with the NeuroSphere Digital Health App.  An exemplary claim chart concerning one way in which Defendants infringe claim 1 of the '707 Patent is attached as Exhibit 7.

53.    Defendants also indirectly infringe the '707 Patent under 35 U.S.C. § 271(b) and (c).

54.    Defendants have knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claim 1 of the '707 Patent (such as customers in this District and throughout the United States) under 35 U.S.C. § 271(b), and continue to do so, by, for example, advertising to customers (e.g., physicians, patients, healthcare organizations, healthcare providers, etc.) and encouraging them to use Abbott's Infinity DBS System because of its performance and reliability, as well as for data security (e.g., protect confidential patient information).  Defendants further advertise that its Infinity DBS system offers secure data management by utilizing

Bluetooth® wireless technology to connect the implanted device to a patient's smartphone application or an Abbott-provided controller.[8] The DBS System may be used with the Abbott NeuroSphere Digital Care platform[9] to allow for secure, encrypted remote programming by clinicians and, in some cases, in-app video chat. *See* Exhibit 7.

55.     Defendants have has also contributed to the direct infringement of at least claim 1 of the '707 Patent under 35 U.S.C. § 271(c), and continue to do so, by, for example, supplying, with knowledge of the '707 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendants have provided, owned, operated, sold, offered to sell, leased, licensed, used, and/or imported various hardware and software that establishes a secure data connection with a Controller app that runs on a mobile device (such as that shown in Exhibit 7) that are not a staple article of commerce and are incapable of substantial noninfringing use.

56.     Malikie has repeatedly offered Defendants the opportunity to license its patents, including the '707 Patent. Defendants have been on notice of the '707 Patent and their infringement since at least June 27, 2025 and further have had notice of the specific factual basis for their infringement of the '707 Patent since at least the filing of this complaint.   On information and belief, Defendants have not taken any action to stop their infringement.

57.     Despite Malikie's repeated efforts, including the provision of multiple notice letters, claim charts, and patent-specific analysis, Defendants have not taken a license, have not negotiated in good faith, and instead continue to make use of Malikie's patented technology

---

[8] *See, e.g.*, https://abbott.mediaroom.com/2018-08-02-Abbott-Expands-its-Directional-Deep-Brain-Stimulation-Therapy-by-Offering-New-MR-Conditional-Labeling#:~:text=This%20new%20approval%20allows%20existing,the%20suite%20of%20system%20upgrades.

[9] *See, e.g.*, https://www.neuromodulation.abbott/us/en/healthcare-professionals/parkinsons.html

without authorization.  As of the filing date of this action, more than six months have elapsed since Plaintiffs made a license offer to Defendants.  Malikie is therefore left with no choice but to bring this action to enforce its rights that Defendants are willfully infringing.

58.    Defendants' infringement is willful in view of the above, and their failure to take any action, even after being put on notice, to stop their infringement or inducement of, or contribution to, infringement by others.

## THIRD CLAIM

### (Infringement of U.S. Patent No. 8,261,338)

59.    Plaintiffs re-allege and incorporate herein by reference the preceding paragraphs of their Complaint.

60.    The claims of the '338 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

61.    The '338 Patent is generally directed to a system and method for distributing and enforcing IT policies on devices that cannot directly communicate with a central policy server. Specifically, a networked device (e.g., a mobile phone) obtains policies from a policy server and relays all or part of those policies to peripheral or other devices (e.g., smart card readers, printers, home PCs) over local links (Bluetooth, Wi-Fi, etc.)

62.    The '338 Patent's claimed arrangements are directed to improvements that enable centralized IT policy management for devices that cannot directly contact the policy server by using an intermediary device.  Prior art centralized policy management servers stored IT policies and either pushed them to, or were polled by, devices that could directly connect.  For devices that could not connect to the policy server, administrators typically configured those devices manually (or left them unmanaged).    Manual configuration was time-consuming, error-prone, and

impractical for devices with limited or no user interface or for devices not owned by the organization and not directly reachable by the server. The claimed invention instead includes the technical improvement of an automated intermediary-based policy distribution that lets a device connected to a central policy server relay all or part of policies to secondary devices that cannot directly reach the server. This enables cross-protocol propagation (e.g., cellular/WLAN to server; Bluetooth/WLAN/Zigbee to peripherals), selective/push delivery tailored to device capabilities, and automated device discovery/reporting and confirmation of policy application. As a result, manual configuration is reduced, enforcement is more reliable and auditable, and centralized management scales to UI-limited or off-network devices.

63.     Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '338 Patent, by making, using, testing, selling, leasing, offering for sale, and/or importing Defendants' neurostimulation systems such as the Abbott Infinity Deep Brain Stimulation (DBS) System with related Patient Controller NR App and the Abbott Liberta RC DBS System with related Patient Controller RC App. Both the Infinity DBS System and Liberta DBS System can be used with the NeuroSphere Digital Health App. An exemplary claim chart concerning one way in which Defendants infringe claim 1 of the '338 Patent is attached as Exhibit 8.

64.     Defendants also indirectly infringe the '338 Patent under 35 U.S.C. § 271(b) and (c).

65.     Defendants have knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claim 1 of the '338 Patent (such as customers in this District and throughout the United States) under 35 U.S.C. § 271(b), and continue to do so, by, for example,

advertising to customers (e.g., physicians, patients, healthcare organizations, healthcare providers, etc.) and encouraging them to use Abbott's Infinity DBS System because of its performance and reliability, as well as for data security (e.g., protect confidential patient information).  Defendants further advertise that its Infinity DBS system offers secure data management by utilizing Bluetooth® wireless technology to connect the implanted device to a patient's smartphone application or an Abbott-provided controller.[10] The DBS System may be used with the Abbott NeuroSphere Digital Care platform[11] to allow for secure, encrypted remote programming by clinicians and, in some cases, in-app video chat.  *See* Exhibit 8.

66.    Defendants have has also contributed to the direct infringement of at least claim 1 of the '338 Patent under 35 U.S.C. § 271(c), and continue to do so, by, for example, supplying, with knowledge of the '338 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use.  For example, Defendants have provided, owned, operated, sold, offered to sell, leased, licensed, used, and/or imported various hardware and software that establishes a secure data connection with a Controller app that runs on a mobile device (such as that shown in Exhibit 8) that are not a staple article of commerce and are incapable of substantial noninfringing use.

67.    Malikie has repeatedly offered Defendants the opportunity to license its patents, including the '338 Patent. Defendants have been on notice of the '338 Patent and their infringement since at least June 27, 2025 and further have had notice of the specific factual basis

---

[10] *See, e.g.*, https://abbott.mediaroom.com/2018-08-02-Abbott-Expands-its-Directional-Deep-Brain-Stimulation-Therapy-by-Offering-New-MR-Conditional-Labeling#:~:text=This%20new%20approval%20allows%20existing,the%20suite%20of%20system%20upgrades.

[11]*See, e.g.*, https://www.neuromodulation.abbott/us/en/healthcare-professionals/parkinsons.html

for their infringement of the '338 Patent since at least the filing of this complaint.   On information and belief, Defendants have not taken any action to stop their infringement.

68.    Despite Malikie's repeated efforts, including the provision of multiple notice letters, claim charts, and patent-specific analysis, Defendants have not taken a license, have not negotiated in good faith, and instead continues to make use of Malikie's patented technology without authorization.  As of the filing date of this action, more than six months have elapsed since Plaintiffs made a license offer to Defendants.  Malikie is therefore left with no choice but to bring this action to enforce its rights that Defendants are willfully infringing.

69.    Defendants' infringement is willful in view of the above, and their failure to take any action, even after being put on notice, to stop their infringement or inducement of, or contribution to, infringement by others.

## FOURTH CLAIM

### (Infringement of U.S. Patent No. 8,447,696)

70.    Plaintiffs re-allege and incorporate herein by reference the preceding paragraphs of their Complaint.

71.    The claims of the '696 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

72.    The '696 Patent is generally directed to a system and related methods for securely establishing data connections between a mobile wireless device application and a peripheral by having the mobile device application handle user approval.

73.    The '696 patent improves security and usability by having a mobile device application handle and authorize peripheral data-connection requests (e.g., prompting or using unlock input) so peripherals that cannot prompt still require user approval.  Prior art relied mainly

on the peripheral or host to prompt for credentials (e.g., PC/cradle-mediated approval), peripherals with their own I/O to authenticate, or standard pairing/authentication protocols (e.g., USB, Bluetooth) that grant connection-level access without explicit on-device approval. The claimed arrangements of the '696 patent instead shift connection authorization to the mobile device by prompting the user (or using unlock input) to approve peripheral data connections, enabling secure support for peripherals without local I/O. They apply across wired and wireless transports and incorporate device authentication and policy enforcement (e.g., retry limits, wipe-on-failure) to reduce unauthorized/Trojan access.

74. Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '696 Patent, by making, using, testing, selling, leasing, offering for sale, and/or importing Defendants' neurostimulation systems such as the Abbott Infinity Deep Brain Stimulation (DBS) System with related Patient Controller NR App and the Abbott Liberta RC DBS System with related Patient Controller RC App. Both the Infinity DBS System and Liberta DBS System can be used with the NeuroSphere Digital Health App. An exemplary claim chart concerning one way in which Defendants infringe claim 1 of the '696 Patent is attached as Exhibit 9.

75. Defendants also indirectly infringe the '696 Patent under 35 U.S.C. § 271(b) and (c).

76. Defendants have knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claim 1 of the '696 Patent (such as customers in this District and throughout the United States) under 35 U.S.C. § 271(b), and continue to do so, by, for example, advertising to customers (e.g., physicians, patients, healthcare organizations, healthcare providers,

etc.) and encouraging them to use Abbott's Infinity DBS System because of its performance and reliability, as well as for data security (e.g., protect confidential patient information). Defendants further advertise that its Infinity DBS system offers secure data management by utilizing Bluetooth® wireless technology to connect the implanted device to a patient's smartphone application or an Abbott-provided controller.[12] The DBS System may be used with the Abbott NeuroSphere Digital Care platform[13] to allow for secure, encrypted remote programming by clinicians and, in some cases, in-app video chat. *See* Exhibit 9.

77.   Defendants have has also contributed to the direct infringement of at least claim 1 of the '696 Patent under 35 U.S.C. § 271(c), and continue to do so, by, for example, supplying, with knowledge of the '696 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendants have provided, owned, operated, sold, offered to sell, leased, licensed, used, and/or imported various hardware and software that establishes a secure data connection using a mobile app that runs on a mobile device (such as that shown in Exhibit 9) that are not a staple article of commerce and are incapable of substantial noninfringing use.

78.   Malikie has repeatedly offered Defendants the opportunity to license its patents, including the '696 Patent. Defendants have been on notice of the '696 Patent and their infringement since at least June 27, 2025 and further have had notice of the specific factual basis for their infringement of the '696 Patent since at least the filing of this complaint. On information and belief, Defendants have not taken any action to stop their infringement.

---

[12] *See, e.g.*, https://abbott.mediaroom.com/2018-08-02-Abbott-Expands-its-Directional-Deep-Brain-Stimulation-Therapy-by-Offering-New-MR-Conditional-Labeling#:~:text=This%20new%20approval%20allows%20existing,the%20suite%20of%20system%20upgrades.

[13] *See, e.g.*, https://www.neuromodulation.abbott/us/en/healthcare-professionals/parkinsons.html

79.    Despite Malikie's repeated efforts, including the provision of multiple notice letters, claim charts, and patent-specific analysis, Defendants have not taken a license, have not negotiated in good faith, and instead continues to make use of Malikie's patented technology without authorization.  As of the filing date of this action, more than six months have elapsed since Plaintiffs made a license offer to Defendants.  Malikie is therefore left with no choice but to bring this action to enforce its rights that Defendants are willfully infringing.

80.    Defendants' infringement is willful in view of the above, and their failure to take any action, even after being put on notice, to stop their infringement or inducement of, or contribution to, infringement by others.

## FIFTH CLAIM

### (Infringement of U.S. Patent No. 11,119,756)

81.    Plaintiffs re-allege and incorporate herein by reference the preceding paragraphs of their Complaint.

82.    The claims of the '756 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

83.    The '756 Patent is generally directed to systems and methods for remotely initiating and controlling software/firmware updates of embedded/IoT devices.  A reachable server (e.g., a "switchboard") is employed to mediate between a user-controlled device (e.g., smartphone) and the target device to trigger and relay an update to the target.

84.    The claimed arrangements of the '756 patent are directed to improvements in remote software/firmware updates by using a central switchboard server to mediate between a user device and a target Internet-of-Things ("IoT") device, enabling initiation, authorization, and progress reporting without physical access even when devices are behind NAT/firewalls.  The

claimed arrangements are also aimed at performing automated readiness checks (e.g., power, activity, location, downloaded payload, etc.) and allow users to defer, schedule, or cancel updates to avoid disrupting device use.  Prior art systems use manual update methods where updates are delivered via portable media (e.g., USB, technician service) requiring physical access to the device.  Prior art systems also use conventional over-the-air or network update systems where devices poll update servers or receive push updates directly, but typically without a mediated server coordinating readiness checks, user-initiated remote start/deferral via a separate user device, or handling firewall or addressability issues.  Instead, the claimed arrangements of the '756 patent include a mediating switchboard server that enables remote user-initiated updates for IoT devices even when not directly addressable.  The claimed arrangements of the '756 patent add readiness checks and user controls (e.g., defer/schedule/cancel) plus progress reporting.

85.    Defendants have been on notice of the '756 Patent and a specific factual basis for their infringement of the '756 Patent since at least the filing of this Complaint.  On information and belief, Defendants have not taken any action to stop their infringement.

86.    Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 14 of the '756 Patent, by making, using, testing, selling, leasing, offering for sale, and/or importing Defendants' neurostimulation systems such as the Abbott Infinity DBS System with related Patient Controller NR App and the Abbott Liberta RC DBS System with related Patient Controller RC App.  Both the Infinity DBS System and Liberta DBS System can be used with the NeuroSphere Digital Health App.  An exemplary claim chart concerning one way in which Defendants infringe claim 14 of the '756 Patent is attached as Exhibit 10.

87.     Defendants also indirectly infringe the '756 Patent under 35 U.S.C. § 271(b) and (c).

88.     Defendants have knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claim 14 of the '756 Patent (such as customers in this District and throughout the United States) under 35 U.S.C. § 271(b), and continue to do so, by, for example, advertising to customers (e.g., physicians, patients, healthcare organizations, healthcare providers, etc.) and encouraging them to use Abbott's DBS product because of its performance and reliability, as well as for data security (e.g., protect confidential patient information). Defendants further advertise that its DBS product offers secure data management by utilizing Bluetooth® wireless technology to connect the implanted device to a patient's smartphone application or an Abbott-provided controller. For example, the Abbott DBS product (e.g., Infinity DBS) may be used with the Abbott NeuroSphere Digital Health mobile app to allow for secure, encrypted remote programming by clinicians (e.g., physicians treating their patients remotely). *See* Exhibit 10.

89.     Defendants have has also contributed to the direct infringement of at least claim 14 of the '756 Patent under 35 U.S.C. § 271(c), and continue to do so, by, for example, supplying, with knowledge of the '756 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendants have provided, owned, operated, sold, offered to sell, leased, licensed, used, and/or imported various hardware and software that establishes a secure data connection with a software app (e.g., Patient Controller NR App, NeuroSphere Digital Health App etc.) that runs on a mobile device (such as that shown in Exhibit 10) that are not a staple article of commerce and are incapable of substantial noninfringing use.

90.     Defendants' ongoing infringement is willful in view of the above, and their failure to take any action to stop their infringement or inducement of, or contribution to, infringement by others.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A. That Defendants have infringed each of the Asserted Patents, and unless enjoined, will continue to infringe one or more of the applicable Asserted Patents;

B. That Defendants' infringement of one or more of the applicable Asserted Patents has been willful;

C. That Defendants pay Plaintiffs' damages adequate to compensate Plaintiffs for Defendants' past infringement of each of the Asserted Patents, and present and future infringement of the applicable Asserted Patents, together with interest and costs under 35 U.S.C. § 284;

D. That Defendants pay prejudgment and post-judgment interest on the damages assessed;

E. That Defendants pay Plaintiffs enhanced damages pursuant to 35 U.S.C. § 284;

F. That Defendants be enjoined from infringing the applicable Asserted Patents, or if its infringement is not enjoined, that Defendants be ordered to pay ongoing royalties to Plaintiffs for any post-judgment infringement of the applicable Asserted Patents;

G. That this is an exceptional case under 35 U.S.C. § 285; and that Defendants pay Plaintiffs' attorneys' fees and costs in this action; and

H. That Plaintiffs be awarded such other and further relief, including equitable relief, as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues triable to a jury.

Dated: July 21, 2026

Respectfully submitted,

/s/ *Eric H. Findlay*
Eric H. Findlay (TX Bar No. 00789886)
FINDLAY CRAFT, P.C.
7270 Crosswater Avenue, Suite B
Tyler, Texas 75703
Tel: (903) 534-1100
Fax: (903) 534-1137
Email: efindlay@findlaycraft.com

Nathan S. Mammen – LEAD ATTORNEY
REICHMAN JORGENSEN
  LEHMAN & FELDBERG, LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 894-7310
nmammen@reichmanjorgensen.com

Matthew G. Berkowitz
REICHMAN JORGENSEN
  LEHMAN & FELDBERG, LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel: (650) 623-1401
mberkowitz@reichmanjorgensen.com

Khue V. Hoang
Rikesh P. Patel
REICHMAN JORGENSEN
  LEHMAN & FELDBERG, LLP
650 Fifth Avenue, Suite 2320
New York, NY 10019
Tel: (212) 381-1965
khoang@reichmanjorgensen.com
rpatel@reichmanjorgensen.com

*Attorneys for Plaintiffs*

26